IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| AQUILA, INC.,<br><br>         Plaintiff,<br><br> vs.<br><br>C. W. MINING,<br>d/b/a CoOp Mining Company,<br><br>         Defendant. | **AMENDED<br>FINDINGS OF FACT<br>AND CONCLUSION OF LAW**<br><br>Case No. 2:05-CV-00555 TC |

## INTRODUCTION

This diversity action arises out of a contract dispute between two companies, Plaintiff Aquila, Inc. ("Aquila") and Defendant C. W. Mining, Inc. ("CWM"). Aquila claims that CWM breached a coal supply contract ("the Contract") with Aquila and that Aquila was damaged by the breach. CWM has raised a number of defenses in support of its argument that its failure to fulfill its obligations under the Contract was excused. After a trial to the court, the court concludes that CWM breached the Contract, that CWM has not shown that its failure to perform should be excused, and that Aquila has suffered damages of $24,841,988.

## FINDINGS OF FACT

**A. The Parties**

Aquila is a Delaware corporation with its principal place of business in Kansas City, Missouri. Aquila provides electric utility service in Missouri and Colorado and natural gas utility service to its customers in Colorado, Iowa, Kansas, and Nebraska. CWM is a Utah corporation and is in the business of coal production in Emery County, Utah.

B.   **The September 2003 Contract**

In April 2003, Aquila was seeking a source of coal for two of its coal-fired power plants located in Missouri—the Lake Road and Sibley plants. When CWM expressed an interest, representatives of the two companies, Elden Kingston for CWM and Phil Rogers for Aquila, met and on September 16, 2003, they executed the Contract, which Aquila had drafted. (Pl.'s Ex. 1.)

The term of the Contract ran from January 1, 2004, to December 31, 2006, although Aquila had an option to extend the Contract for an additional two years (through December 2008). The Contract required CWM to deliver 450,000 tons of coal during 2004 and 550,000 tons of coal in 2005 and 2006. If Aquila exercised its option to extend the Contract until 2008, CWM was obligated to deliver 550,000 tons of coal in each of the two additional years. The Contract required Aquila to pay CWM $19.40 per ton in 2004, $19.99 in 2005, $20.59 in 2006, $21.62 in 2007 and $22.72 in 2008. The Contract included requirements concerning the quality of the coal to be delivered by CWM with certain price adjustments made based upon the quality. The Contract included a Force Majeure provision, which is discussed in more detail below.

C.   **Performance of the Contract and Force Majeure**

CWM does not dispute that it failed to deliver the quantity and quality of coal required by the Contract. Specifically, CWM delivered only 127,807 tons of coal to Aquila in 2004 and 32,148 tons in 2005. After that, CWM delivered no coal to Aquila. Aquila is adamant that if CWM had tendered the amount of coal required by the Contract for those years, Aquila would have purchased it.

But CWM claims that its admitted failure to perform was legally excused. CWM's chief defense is that labor problems and geological problems interfered with its coal production and so

its performance was excused under the force majeure clause of the Contract.  CWM also raises other defenses to excuse its performance.

     1.     The Labor Dispute

Charles Reynolds, a long-time employee of CWM and now the president, testified about CWM's coal production and the various problems CWM experienced during the life of the Contract.  According to Mr. Reynolds, in 2001 and 2002, CWM's annual coal production was between 1 million and 1.2 million tons.  CWM believed that it would produce the same amount in 2003 but would increase production in the next few years.  CWM intended to use coal from its number one mine to fill its obligations to Aquila.  At the time it entered into the Contract, the number one mine had approximately 1.8 million tons remaining, or about two year's worth of reserves.  CWM also anticipated that in the future, it would be producing coal from its number three and four mines where CWM was just beginning to mine.  (CWM's number two mine had been exhausted and was no longer in operation.)

CWM's labor problems began in September 2003 when between 50 and 70 of CWM's 120 employees walked out.  Some left in protest over actions taken by CWM to discipline an employee, William Estrada, and some left because of dissatisfaction with wages and what the employees believed were inadequate benefits.  But according to CWM, because CWM was a party to a collective bargaining agreement with the International Association of United Workers Union (hereinafter "IAUWU") which prohibited the workers from striking, CWM understandably believed that all labor issues would be quickly resolved.

CWM made efforts to hire replacement workers.  Mr. Reynolds described those efforts:

> We contacted the job service office, let them know we needed employees.  We
> also contacted the employees that were still working, let them know if they knew
> of anyone needing—that was interested in working, that we'd make jobs
> available.  We also published ads for jobs in the local newspaper.  And we—we

> contacted the company called price mine service, which is a mine contracting company that's in the Price area there to see if they had available contract workers.

(Transcript of Feb. 13, 2007 (hereinafter "Feb. 13 Tr.") at 166.)

CWM was able to hire between twenty-five and thirty replacement workers, six or eight of whom were full-time workers, the rest part-time.  CWM, as part of an agreement that it reached with the IAUWU, prepared a list showing that as of April 1, 2004, it had only three job openings.  (Pl.'s Ex. 67.)

    2.    Geological Problems

In addition to the labor problems, CWM was experiencing other problems which ultimately forced it to close the number one mine, losing the 1.8 million tons of coal it had anticipated producing for Aquila.  First, in the fall of 2003, there were several roof collapses.  Aquila claims that a shortage of manpower prevented CWM from fixing the roofs.  But as a result of the roof collapses, in January 2004, the Federal Mine Safety and Health Administration (hereinafter "MSHA") ordered CWM to seal the number one mine.  (The mine remains permanently sealed.)

At the time MSHA ordered CWM to seal the number one mine, neither the number three nor the number four mine was fully operational.  But, as Mr. Reynolds explained, CWM still believed that it could meet all its contractual requirements.  Mr. Reynolds testified:

> Now, we figured we were still okay as far as our contracts, but the production was going to be low for the next 60 to 90 days because we had to—there's a block of coal out here in this seam that has no coal above it.  There's no coal in the tank seam over that area.  And so we figured we could go in here and retreat this coal without affecting any reserves and it would still give us some retreat mining to meet our contracts with.  And so in December of 2003 and January 2004 we began developing down into that block to generate a block to replace the reserves we had lost in the number one mine.

(Feb. 13 Tr. 175.)

Soon, though, CWM ran into trouble in the number three mine. Mr. Reynolds testified that:

> in mid-March, as we were developing south in the number three mine, we began to encounter coal that was extremely high temperatures. And as we continued to mine, we found we were mining into an area that appeared to be actively on fire. And so we made the decision to turn and try to go around that.

(Id. at 180.)

CWM was, at the same time, readying mine number four for production, but because the development was going slowly, CWM depended on coal from the number three mine to meet its requirements. But CWM was running into problems in the number three mine. Ken Defa, a long-time CWM employee, testified that as the miners advanced into the number three mine, "[t]he floor turned to mud, and we had a pretty tough time mining because of the muddy conditions." (Transcript of Feb. 14, 2007 (hereinafter "Feb. 14 Tr.") at 8.) According to Mr. Defa, he had never encountered so much mud in a mine throughout his thirty-eight years of mining. (Id. at 9.) The miners also ran into roof problems and hot spots in the number three mine.

Despite CWM's claim that its labor problems caused its inability to perform under the Contract, the evidence leads to the conclusion that it was a combination of the closure of the number one mine, the muddy conditions and the hot coal in the number three mine, and the fact that CWM had not begun full production from the number four mine, that accounted for CWM having only three job openings in April 2004. In fact, Mr. Reynolds testified that:

> the reason for the list being short at that time was we had encountered that hot spot in the one section, and we were working on the rock tunnel in the other section, and we had no other areas to put the employees to work at that time. And so that was the reason for the job list as short as it was.

(Feb. 13 Tr. 216.)

Moreover, the problems with the number three mine and the slow development of mine four appear to be the immediate reason that in April 2005, CWM notified Aquila that it was canceling the Contract. Mr. Reynolds testified, in response to a question why CWM cancelled the Contract, that CWM had again run into a hot spot in mine number three "[a]nd we could see there was no coal ahead of us in the near future that we could retreat . . . and we knew that we were not going to fill the—be able to fill the production levels because of that burnout and because of the hot zone there, that the reserves we thought we had were not there." (Id. at 185.)

**D.**     **Notice to Aquila**

   1.     Written Notice

On December 22, 2003, CWM sent a letter notifying Aquila that because of "labor problems . . . [a]s per section 13 'Force Majeure' of our coal supply contract, we are notifying all of our customers that we may have to reduce our shipments over the next 60 to 90 days." (Pl.'s Ex. 4.) CWM wrote Aquila on April 8, 2004, that "due to the continued labor situation . . . [i]t appears that our 2d quarter 2004 production will be approximately 50% of normal." (Pl.'s Ex. 5.) On September 3, 2004, CWM sent Aquila "an update on the Force Majeure problems." (Pl.'s Ex. 6.) CWM discussed progress in "the current employment situation" and expressed optimism that because of an agreement with the National Labor Relations Board, CWM would soon "begin to get our labor force back to normal." (Id.)

Aquila wrote CWM on August 25, 2004, with questions about CWM's "most recent notice of Force Majeure dated April 8, 2004 . . . ." (Pl.'s Ex. 7.) Specifically, Aquila asked for information about the amount of coal CWM expected to send Aquila "during the fourth quarter of 2004 and calendar year 2005, together with any other information that will enable Aquila to adequately cover expected short positions in a timely manner." (Id.) Aquila also asked for

information about CWM's "plan to mitigate or remedy its labor disputes that could affect its ability to perform under the Agreement for the fourth quarter of 2004 and calendar year 2005." (Id.)

In a letter dated April 18, 2005, CWM wrote Aquila that it was terminating the Contract:

> [d]ue to the fact that we have not been able to fulfill our tonnage requirements, and it appears that this problem may be extended throughout a good part of this year, it was decided at a recent meeting of the board of directors, that we should cancel this contract as per paragraph 13B "If a Force Majeure continues for more than six (6) months then either party may terminate this Agreement by giving written notice to the other party without penalty or cost."

(Pl.'s Ex. 10.)

In the same letter, CWM offered to continue producing coal for Aquila under a new contract: "[w]e would still be very much interested in discussing a new coal supply agreement that would take into account our present production, then increasing our production when this Force Majeure problem is solved." (Id.) Aquila declined CWM's offer.

It is undisputed that in all of its written notices to Aquila, CWM did not refer to anything other than its labor problems as a force majeure event. In fact, in a letter CWM sent Aquila two months after it canceled the Contract, CWM described only the labor problem as a force majeure. (Pl.'s Ex. 9.)

    2.    Actual Notice

Even though CWM did not send written notice to Aquila of any of CWM's other problems, Aquila learned about them. In March 2004, Phil Rogers visited the CWM mining operation. Charles Reynolds told Mr. Rogers that mine number one was closed, showed him maps of mines three and four, and took him to inspect mine three. On a later visit to CWM in June 2004, Mr. Reynolds took Mr. Rogers into both mines three and four and discussed with Mr.

Rogers the hot spots and muddy conditions. But no one from CWM told Mr. Rogers that CWM considered these to be possible force majeure events.

E.     **Purchase of Cover Coal by Aquila**

When CWM did not deliver all the coal required by the Contract, Aquila purchased coal on the "spot market" in 2004 and 2005. Once Aquila had been notified in April 2005 that CWM was canceling the Contract, Aquila found another long-term supplier, Consolidated Coal Company. Because the market price for coal had gone up since Aquila and CWM entered into the Contract, Aquila paid more for the replacement coal it bought.

The terms of the Consolidated Coal contract were less favorable to Aquila than those of the Contract. In addition to costing more, the coal from Consolidated Coal had a higher sulfur content than the coal called for in the Contract, which forced Aquila to buy sulfur emission credits before it could burn the coal.

## CONCLUSIONS OF LAW

CWM does not dispute that it failed to deliver the required amount of coal. But CWM asserts several defenses that it claims excuse its failure to perform. It is CWM's burden to establish its affirmative defenses by a preponderance of the evidence. Gennari v. Prudential Ins. Co. of America, 335 S.W.2d 55, 60 (Mo. 1960).[1] CWM's chief defense is that its performance was excused under the Contract's force majeure provision.

1.     **CWM has Failed to Prove that its Performance was Excused as a Force Majeure.**

Section 12(A) of the Contract defines "force majeure" as "any and all causes beyond the reasonable control of the party failing to perform . . . ." (Pl.'s Ex. 1, § 13(A).) The event must

---

[1] The Contract provides that it will be construed and interpreted using Missouri law. (Pl.'s Ex. 1, § 13(A).)

"wholly or partly prevent or make unreasonably costly (I) the mining, delivering or loading of coal . . . ." (Id.)

If a party is experiencing a force majeure, section 13(B) excuses that party's performance with certain limitations:

> If, because of any Force Majeure, either party hereto is unable to fulfill any of its obligations under this Agreement, and if such party shall promptly give to the other party concerned written notice of such Force Majeure, then the obligation of the party giving such notice shall be suspended . . . .

(Id. at § 13(B) (emphasis added).)

Although CWM maintains that its various problems were force majeure events under the Contract, that these events lasted six months and therefore, its performance was excused, the court concludes that CWM has failed to show that the force majeure provisions of the Contract excused its performance.

First, CWM never gave Aquila written notice that it considered the hot spot, the closure of the number one mine, the roof collapses or the muddy conditions force majeure events. The fact that Aquila knew of these other problems does not excuse CWM's obligation under the Contract to notify Aquila, in writing, that it considered these events as force majeure events. (Moreover, Aquila did not know that CWM considered these conditions as force majeure events.) The Contract specifically required, in Section 13(B), that written notice of any force majeure be given in writing. The necessity of written notice is repeated in Section 15(A): "[a]ny notice, request, consent, demand, report or statement which is given to or made upon either party hereto by the other party hereto under any of the provisions of this Agreement shall be in writing unless it is otherwise specifically provided herein . . . ." (Id. at § 15(A).)

9

Because the parties expressly agreed that written notice of a force majeure event must be given in order to excuse CWM's performance, and no written notice was given, CWM's failure to perform is not excused by the closure of the number one mine, the hot spots, muddy conditions and roof collapses.

Even though CWM did provide Aquila written notice of its labor problems, CWM has not met its burden of showing that the labor problems <u>by themselves</u> excuse CWM's failure to perform. Although the labor problems had some impact on CWM's coal production, how much impact is not clear. In fact, the evidence leads the court to conclude that CWM's failure to perform was caused, primarily, by its various geological problems and not by the labor dispute. Accordingly, CWM cannot rely on the force majeure provision of the Contract to excuse its failure to perform.

**2.    CWM's Defenses of Impossibility of Performance, Frustration of Purpose, and U.C.C. § 2-615(a) Do Not Excuse CWM's Failure to Perform.**

In addition to its reliance on the force majeure provision of the Contract, CWM maintains that its performance is excused by the defenses of impossibility of performance, frustration of purpose and Uniform Commercial Code (hereinafter "U.C.C.") § 2-615(a). CWM points to the same conditions that were the basis of its force majeure defense to support these additional defenses, that is, the labor problems and various geological problems and conditions.

The defenses of force majeure, impossibility of performance, frustration of purpose, and U.C.C. § 2-615(a) are closely related, if not identical. The Restatement (Second) of Contracts treats them together under the heading "Discharge by Supervening Impracticability." Restatement (Second) of Contracts § 261 (1981). The importance of this is that the parties specifically set the terms and conditions, in the force majeure provisions of the Contract, when supervening events would excuse performance. Section 13(A) requires that the event must

"wholly or partly prevent or make unreasonably costly (I) the mining, delivering or loading of coal . . . ." (Pl.'s Ex. 1, § 13A.)  And Section 13(B) imposes a written notice requirement.  As discussed, CWM failed to establish that it met either of those requirements.  And CWM cannot rely on common law defenses and the U.C.C., thereby circumventing the terms and limitations that the parties negotiated in the Contract.

Accordingly, because CWM has failed to establish that its performance is excused by the force majeure provisions, CWM's performance is not excused under the defenses of impossibility of performance, frustration of purpose, and U.C.C. § 2-615(a).

**3.     CWM has Not Proved Waiver or Estoppel.**

CWM contends that when Aquila continued to accept coal shipments from CWM that were less than the required amounts, it either waived its claim that CWM breached the Contract or is estopped from asserting its claim.  Other than Aquila's acceptance of the coal, CWM cites to no evidence in support of these arguments.  And Aquila's continued acceptance of incomplete shipments of coal from CWM is understandable in light of CWM's continued assurances that its labor problems were temporary, thereby leading Aquila to believe that CWM would be in a position to ship all the coal that was required by the Contract.

Also, the plain language of the Contract does not support CWM's argument:

> The failure of either party hereto to insist in any one (1) or more instances upon strict performance of any provision of this Agreement by the other party hereto . . . shall not be construed as a waiver of it of any such provisions, or of the obligation to comply with such provisions in the future and the same shall continue and remain in full force and effect.

(Pl.'s Ex. 1, § 16(A).)

In addition, on August 25, 2004, Aquila sent a letter informing CWM "[f]or the avoidance of doubt, Aquila does not, with this letter and the requests contained herein, waive any

11

rights it has or excuse CoOp Mining from any obligations it has under the Agreement . . . ." (Pl.'s Ex. 7.)

Based on the evidence above, the court concludes that CWM has failed to establish either that Aquila waived its claim or is estopped from asserting its claim.

**4.      CWM has Not Shown that Aquila Failed to Mitigate its Damages.**

CWM appears to argue that Aquila failed to mitigate its damages in two ways.  First, that Aquila did not accept CWM's offer to enter into negotiations for a new coal supply agreement.  Second, that Aquila could have purchased less expensive and better quality cover coal.  Neither argument is persuasive.

In CWM's letter of April 18, 2005, telling Aquila that CWM was canceling the Contract, CWM wrote, in the last paragraph, "[w]e would still be very much interested in discussing a new coal supply agreement . . . ."  (Pl.'s Ex. 10.)  Aquila did not accept because, as Philip Rogers testified, "I did not consider them [CWM] to be a viable supplier of coal."  (Feb. 12 Tr. 57.) Aquila's response and decision was justified given CWM's failure to perform its obligations under the Contract.

Aquila's purchase of coal on the spot market was also justified.  Aquila believed, based on the reassurances of CWM, that CWM's failure to deliver the full amounts of coal was temporary.  Aquila, did not want to enter into another long-term contract with another coal supplier because once CWM resumed complete deliveries, Aquila would be obligated to purchase more coal than it needed.

When CWM notified Aquila that it was canceling the Contract, Aquila entered into a long-term contract with Consolidated Coal.  Abby Herl, who replaced Philip Rogers as director of coal procurement, explained the process Aquila followed in deciding whether to enter into the

agreement with Consolidated Coal.  Based on Ms. Herl's testimony, the court concludes that Aquila carefully weighed its options and the competing bids and chose the contract that was the most advantageous to Aquila.  CWM offered no persuasive evidence to counter that evidence.

Accordingly, the court finds that CWM has not shown that Aquila failed to mitigate its damages.

**5.        Aquila is Entitled to $24,841,988 in Damages.**

Aquila claims damages of $53,742,89.  In support of its claim, Aquila called an expert witness, Michael Lewis.  Mr. Lewis testified that Aquila was financially harmed by CWM's breach of the Contract and that it will continue to be harmed through 2008.  Mr. Lewis testified that Aquila's damages were the result of two factors.  First (and most significantly), Aquila was forced to buy coal in an "unfavorable market" because "coal prices have just gone up significantly since the contract was struck." (Feb. 13 Tr. 26.)  For example, Mr. Lewis testified that from December through late summer in 2004, the Uinta Basin coal price increased "significantly, going from . . . $17, $18 a ton to $30.  And then again in July of '05—really June of '05 through the end of the year '05 the price of Uinta Basin coal went above about $35 or $37 a ton." (Id. at 28-29.)  The second factor Mr. Lewis gave was that the replacement coal Aquila purchased had a higher sulfur content than the coal called for in the Contract.  This forced Aquila to buy sulfur emission credits in order to burn the lower-quality coal.

Mr. Lewis separated his analysis of damages into three components.  Mr. Lewis explained how he arrived at the first component:

> In my terms it's a but for analysis.  We look at what the cost of Aquila acquiring coal would have been from C.W. Mining had they performed under the Contract for the amount of tons Aquila actually burned in the two plants, and we compare that to the amount that Aquila spent to actually buy the cover coal burn in those two plants.

13

(Feb. 14 Tr. 31.)  According to Mr. Lewis, the present day value of that amount is $24,841,988.  (Id. at 39.)

Because Aquila had an option to extend the Contract for an additional two years (through December 2008), Mr. Lewis calculated the difference between what Aquila projects it will have to pay for coal during that time and what it would have paid under the Contract.  This figure, $15,893,379, is the second component.  Mr. Lewis admitted that he didn't not know what the price of coal would be in 2008.[2]  He also admitted that he did not know the sulfur content of the coal Aquila would purchase in 2008 and therefore, he did not know what would be the cost to Aquila of purchasing sulfur emission credits.  Mr. Lewis averaged the price of coal for the last three years to arrive at a projected cost.  He did the same to estimate the cost of purchasing emission credits.

The third component, Mr. Lewis explained, was based on the fact that Aquila had the right, under the Contract, to acquire more coal from CWM than it actually purchased and burned in 2004, 2005, and 2006.  Mr. Lewis assumed, given the favorable terms of the Contract, that Aquila would have purchased the maximum amount of coal from CWM, had CWM performed, and either stockpiled the excess coal for later use or sold it to a third party, at market prices. Mr. Lewis testified that:

> [w]hat we looked at in coming up with the damages from component three is we compared and focused only on the difference between what it would have cost them to acquire those tons versus what they would have been able to sell them for or the value in the market, and whether they actually had stockpiled them or sold them to another source.

(Id. at 44.)  The component three amount is $13,026,888.

---

[2]In fact, as Mr. Lewis acknowledged, the price of coal, at least at the time of trial, was going down.

The component one damage amount, is the only component that is based on actual data. The price of coal and sulfur content were, as Mr. Lewis made clear, the two key factors in Aquila's loss. Mr. Lewis candidly admitted that he had to "forecast" what the price of coal would be in 2008. (Id. at 51.) Moreover, Mr. Lewis did not know the sulfur content of the coal that Aquila would be buying in the future, so, he had to estimate what Aquila would pay for emission credits.

The general rule of damages for breach of contract is that:

> the compensation should be equal to the injury, subject to the condition that the damages be confined to those naturally and proximately resulting from the breach, and be not uncertain or speculative, nor outside the contemplation of the parties.

Mayfield v. Richardson Mach. Co., 231 S.W. 288, 293 (Mo. App. 1921).

This proposition, set forth many years ago, has not changed. The Missouri Court of Appeals stated, in describing a claim for future profits, that in support of such a claim, "the evidence must be sufficiently definite and certain for the jury to make a reasonably accurate estimate of the loss without resorting to speculation. Because future profits are considered 'too remote, speculative and too dependent upon changing circumstances', our courts have viewed the recovery of such losses cautiously." Chmieleski v. City Prod. Corp., 660 S.W.2d 275, 298 (Mo. App. 1983) (internal citations omitted).

Because the court concludes that Aquila's second and third damage components are too speculative, the court awards Aquila damages of $24,841,988.

SO ORDERED this 30th day of October, 2007.

BY THE COURT:

*Tena Campbell*

Tena Campbell
Chief Judge